# IN THE UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE THE GUITAMMER COMPANY<br>*Debtor* | CASE NO. 21-50832<br>JUDGE<br>CHAPTER 11<br>SUBCHAPTER V |

### VERIFIED STATEMENT OF MARK LUDEN PRESIDENT OF THE GUITAMMER COMPANY IN SUPPORT OF FIRST DAY MOTIONS

The Guitammer Company, as debtor and debtor in-possession herein, ("Debtor") supplies this verified statement of its President Mark Luden as background for the Court in particular with regard to its Emergency Motion For Authority To Use Cash Collateral, To Provide Adequate Protection And Request For Immediate Hearing [Doc. 5]; (2) its Motion For Order (A) Authorizing (i) Payment Of Pre-Petition Wages, Salaries And Employee Benefits, (ii) Reimbursement Of Employee Business Expenses And (iii) Payment Of Other Employee-Related Amounts And (B) Authorizing Applicable Banks And Other Financial Institutions To Receive, Process, Honor And Pay All Checks And Drafts Drawn And Utilize Internet Account Access To Process Transactions On Accounts Of The Debtor [Doc. 6] and (3) any other matters that might require the immediate attention of the Court. (the "First Day Motions").

### PURPOSE OF THIS REORGANIZATION

I am the president and CEO of the Debtor and I make this statement from my personal knowledge.

The Debtor is the designer and seller of ButtKicker® brand low frequency audio transducers, amplifiers and accessories for the cinema, gaming, home theater, virtual reality, and music markets. The Debtor is also the creator of haptic-tactile broadcasting for live streaming sports and other events. The Debtor is based in Westerville Ohio and currently employs six people.

The Debtor has been historically and chronically undercapitalized and over-leveraged. A large majority of free cash flow historically has been used to pay for debt service and not working or growth capital. Since 1999 the Debtor has raised approximately $8 million in equity investment (net of non-cash entries). During the same period, the Debtor also borrowed approximately $3.6 million, incurring approximately $4.33 million of interest expense. As of December 31, 2020, the Debtor had an accumulated deficit of approximately ($13,175,240), a cash balance of $120,751 and working capital deficiency of approximately ($3,033,960).

The Company has never been able to generate enough sales to adequately service and pay down its debt. It has never been able to receive enough investment to stabilize its balance sheet and provide both adequate working capital and growth capital. Rather it raised just enough debt or equity to stay in business a little longer. The Debtor's current capital structure prevents the Debtor from attracting enough investment to enable it to become operationally cash flow positive and reduce its working capital deficit. Therefore, the Board believes that unless the Debtor reorganizes its debt it will never be able to operate profitably and will be forced to liquidate.

### EARLY HISTORY 1990-2003

The Debtor was founded by Ken McCaw in 1990 to develop and sell a patented guitar accessory, the "hammer-jammer". Equity in the Debtor was sold to friends of the founder. During that time the idea, prototypes and early market tests were done on a new type of tactile device, a "silent subwoofer" for entertainment use. A patent for the aptly named "ButtKicker®" was applied for in 1998 and issued in 1999.

In late 1998 and early 1999 current president and CEO Mark Luden, and CJG shareholder Marvin Clamme joined the Debtor as full-time employees. They joined the Debtor based on the expectation that the ButtKicker patent would soon be issued, and strong initial interest in it from potential customers at the National Association of Music Merchants

("NAMM") trade show. Debtor's founder further thought that the Debtor would be able to raise $5 million from his contacts in entertainment industry. However, the Debtor was unsuccessful in its early fund-raising efforts and day to day operations were funded by Mr. Luden out of his 401K plan.

In 1999 Eminence Speaker began manufacturing the ButtKicker® product for the Debtor. Several members of the Gault family that owned Eminence Speaker also purchased Debtor stock to further fund Debtor's operations. As Debtor's sales began to increase, in 2003 Eminence's owner, Mrs. Thelma Gault, loaned Debtor $800,000 as part of an exclusive manufacturing agreement with Eminence Speaker.

### CONSUMER PRODUCTS AND BERKLINE BENCHCRAFT 2003-2008

From 2003 to 2009 the Debtor developed more and more ButtKicker brand products and accessories to make it easier to use and install ButtKicker products in gaming, home theater and car audio.

In 2003 the Debtor secured one of the largest home furnishing companies of the time, Berkline Benchcraft, as an exclusive OEM partner to resell their home theater seating with built in ButtKicker products. From 2003 to 2011 the Debtor had sales of $2.8 million to Berkline. Unfortunately, due to the "great recession" Berkline ultimately filed chapter 7 bankruptcy and was eventually liquidated.

In 2005 the Debtor launched a consumer product designed for sale in consumer electronics big box stores and raised $550,000 in debt financing from local Columbus, Ohio "angel" investors to fund inventory. These loans had a 20% interest rate and offered warrants to purchase the Debtor's stock at a discounted level. Although the Debtor's retail consumer product was modestly successful, it never generated enough sales to service or pay down the angel debt. In hindsight this debt combined with the other debt put the Debtor's balance sheet into a negative

position that from which it was never able to recover.

The Debtor continued to need investment capital and borrowed funds from Walter J. Doyle, Trustee of the Walter J. Doyle Trust dated February 5, 1992, and Francine I. Jacobs, Trustee of the Revocable Trust Created by Julie E. Jacobs under Agreement dated November 25, 1999 (collectively "Doyle and Jacobs"), and from Walter J. Doyle personally or entities controlled by him. The Debtor was approved for a loan of up to approximately $1.083 million on April 25, 2008 from the "Innovation Ohio Loan Fund" (IOLF) and ultimately borrowed $703,656.46.  The IOLF loan is serviced by the State of Ohio Development Services Agency ("DSA"). The IOLF loan was secured by a blanket security interest against all assets of the Debtor. The DSA timely filed a UCC Financing Statement ("UCCFS") with the Secretary of State of Ohio and filed continuation statements to preserve the perfection of its security interest against all assets of the Debtor through the Petition Date.

### GOING PUBLIC, LIVE HAPTIC BROADCASTING & LOW FREQUENCY TRANSDUCER MANUFACTURING JOINT VENTURE 2009-2016

In early 2009 the Debtor was approached by a Canadian investor group interested to take the Debtor public on the Toronto Stock Exchange Venture ("TSXV").  The plan was to raise between $2 and $4 million as well as convert the Debtor's existing debt to stock. Expectations were high due to the fact a Canadian company selling a similar technology in the same markets had raised over $20 million and was currently trading on the TSXV. The Debtor secured $350,000 in debt bridge funding to reach the listing. However, as the great recession deepened, the investment markets collapsed and the opportunity to list on the TSXV was lost.

The Debtor again needed additional financing and on or about March 9, 2009 the Debtor and Doyle and Jacobs entered into a Credit Facilitation Agreement. Pursuant to the Credit Facilitation Agreement, Doyle and Jacobs pledged securities to enable the Debtor to obtain two

lines of credit and the total amount of $400,000 with Bank of America, N.A. through its division Merrill Lynch Bank NA ("Merrill Lynch"). The Debtor currently owes Merrill Lynch $393,414.98 under the LMA and therefore is obligated to Doyle and Jacobs for that amount as well.

In connection with the Credit Facilitation Agreement with Doyle and Jacobs, Doyle and Jacobs and the DSA entered into a subordination agreement dated November 29, 2010 whereby the DSA subordinated payment on its claims to Doyle and Jacobs to the total amount of $700,000, and further unconditionally assigned its rights under its loan agreement and security interest to Doyle and Jacobs. Accordingly, Doyle and Jacobs hold the DoD's blanket security interest against all assets of the Debtor.[1]

During this time, a new product called ButtKicker Live! haptic broadcasting was conceived and took shape. The development and implementation of ButtKicker Live! haptic broadcasting would require further investment in the Debtor's operations, and the Debtor spent considerable time, energy, efforts, and money trying to commercialize this technology. The Company ultimately ceased its efforts to commercialize this technology due to lack of funds. A chronology of these efforts is as follows.

In 2007 the Debtor began to develop "4D Sports powered by ButtKicker", originally named "ButtKicker Live! ®" which enables haptic and tactile events to be broadcast in addition to and distinct from a live broadcast' audio and video. In March of 2011, the Debtor was issued US Patent #7,911328 for this technology and in late 2011 the Debtor began marketing this

---

[1] Ms. Gault also entered into an identical subordination agreement on the same date subordinating payment of her claims to $700,000 to Doyle and Jacobs and assigning her security interest to them.

technology to potential customers in the sports, broadcast, and distribution markets.[2] In January of 2015, the Debtor filed additional US and International patents to help expand its intellectual property in the broadcast markets.  In 2020 patents were issued under the EPTO scheme and in China.

The Company believed that haptic-tactile broadcasting combined with growing trend of "over-the-top" content, "second screen" viewer experiences, and increasing deployment of internet broadcasting, would allow it to offer value added opportunities to broadcasters, distributors, and sports leagues using this technology.

To fund this development the Debtor's board decided to self-list as a publicly traded stock on the OTC BB. To that end The Guitammer Company, a Nevada corporation, was formed ("Guitammer Nevada") and acquired all the stock of the Debtor.  Guitammer Nevada was then listed on the OTC BB by filing a Form 10 with the SEC. Concurrent with the listing, a private placement (PPM) raised additional equity investment from accredited individual investors with the assistance of a licensed broker.

Between July of 2011 and September of 2012 Guitammer Nevada received $2.085 million in equity funding from the PPM. In December of 2011 $882,550 of debt in the Debtor was converted to common stock in Guitammer Nevada.  This amount was approximately one half of what the Debtor was trying to raise.

This money was largely used to attempt to commercialize the Debtor's live haptic-tactile broadcast technology. In July 2013, the Debtor and the National Hot Rod Association ("NHRA") executed the "Broadcast Technology and Promotional Rights Agreement." The NHRA telecasts

---

[2] The Debtor released "The Making of Tactile Broadcasting" in the fall of 2013 explaining and demonstrating this new broadcast technology available on the Guitammer YouTube channel or directly at: http://www.youtube.com/watch?feature=player_embedded&v=RQ3lPbtDt5E .

were to be broadcast with an enhanced tactile effect in "4D powered by ButtKicker" beginning with their September 14th, 2013 telecast and all subsequent 2013 telecasts on ESPN2. This Agreement ended January of 2014.

In August of 2014 the Debtor, the San Jose Sharks ("Sharks") NHL hockey team and Comcast SportsNet California ("CSNCA") executed a "Letter Agreement Regarding Technology Initiative" to integrate Debtor's broadcast technology in the SAP Center at San Jose and into the CSNCA's telecasts of the San Jose Sharks home games at the SAP Center. During the 2014/15 NHL season, all the CSNCA's Sharks telecasts were successfully broadcast with the addition of the haptic signal, i.e., "in 4D", using Guitammer's technology[3].

The Debtor was also actively engaged with the Society of Motion Pictures & Television Engineers (SMPTE) and the Institute of Electrical and Electronics Engineers (IEEE) drafting standards for haptic-tactile broadcasting to help facilitate wide adoption of haptic-tactile broadcasting using the Debtor's technology. In August of 2017 SMPTE Standard, ST 2100-1, "Definition and Representation of Haptic-Tactile Essence for Broadcast Production Applications" was published.

Even following the Sharks test, and the SMPTE Standard being published, the Debtor remained unable to secure additional financing from financial or strategic investors to commercialize its haptic broadcast/streaming technology and therefore was forced to focus solely on hardware product sales. The Company ended its involvement with SMPTE and its active engagement with the IEEE due to cash flow constraints.

At the beginning in 2012 the Debtor had enough cash to begin to sell ButtKicker brand hardware in higher volume than in the prior year. However, the cash and effort put into

---

[3] Reviews were very favorable including this review which aired in the San Jose area in January of 2015: https://www.youtube.com/watch?v=0AkMpTo8tXs&feature=youtu.be

development of ButtKicker Live! along with the limited amount of capital raised, began to limit ButtKicker sales which began to decline as net income losses accelerated.

Guitammer Nevada's stock traded under the symbol "GTMM" but never achieved any meaningful daily trading volume and received little to no interest from retail or institutional investors, despite engaging several reputable investor relation firms to increase awareness of the stock. As the trading volume decreased, and the share price decreased from $0.25 per share to less than a penny.

In 2014 Guitammer Nevada hired an investment banker to try and raise $5 to $10 million from institutional investors so that the company could fund its working capital deficit and be able to move to a listed exchange such as the NASDAQ or NYSE.

In 2015 and 2016 Guitammer Nevada raised $600,000 in Series A Preferred Stock from three existing investors to fund the Debtor's operations.  Given the ongoing operational losses, the Guitammer board decided to try and sell the Debtor to a strategic buyer and/or license its products and technology. The Guitammer board hired two different investment banking firms to lead its efforts and contacted dozens of potential acquirers trying to attract interest. In 2016 the Debtor did secure a non-binding Memo of Understanding ("MOU") to license its products and technology from a company in the cinema market.  The MOU did not close as the cinema company was sold to a private equity firm who chose to abandon the licensing agreement.

In 2014 the Debtor was approached by a local Ohio manufacturing company with factories in Ohio and China and a history of partnering with product companies to form manufacturing joint ventures, IMI International Inc. ("IMI"). The Debtor formed LFT Manufacturing, LLC ("LFT") with this company. The Debtor owns 50% of LFT with a related company to IMI, IMI Direct LLC, owning the other 50%. George Anasis is the principal in the

IMI entities.

In 2016 the Debtor entered into an Inventory Financing Agreement ("IFA") with IMI and LFT which secured a steady supply of inventory and helped increase sales for the Debtor. Under the IFA LFT supplies product to the Debtor on a consignment basis, and IMI files a UCCFS for each shipment with the Ohio Secretary of State. IMI owns the shipped products until sale and owns the account generated from the sale of the LFT products. Payment for the product is due to LFT when it is sold, and as each consigned shipment is sold and payment is received by LFT, IMI releases each UCCFS. It took until 2017 for LFT to begin production of the Debtor's products in larger quantities.

In 2016 the Guitammer Nevada filed its 10Q quarterly report with the SEC for the 3rd Quarter and thereafter was unable to afford the cost of being audited and stopped filing its annual 10K and quarterly 10Q's with the SEC. Therefore in 2018 Guitammer Nevada filed Form 15, "CERTIFICATION AND NOTICE OF TERMINATION OF REGISTRATION UNDER SECTION 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934 OR SUSPENSION OF DUTY TO FILE REPORTS UNDER SECTIONS 13 AND 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934" with the SEC to remove itself from all public reporting requirements, including financial reporting, effectively "going dark".

### STRATEGIC SALE, REFOCUS ON BUTTKICKER HARDWARE SALES IN CINEMA AND GAMING 2017-PRESENT

Sales increased in 2017 but then decreased in 2018. The Company's cash deficit was so great that four of the Debtor's employees worked without pay or with significantly reduced pay in 2017 and 2018, and the CFO was laid off in March of 2019. In March of 2019, these four employees were given promissory notes, due in March of 2024, in lieu of pay. From 2018 through the early part of 2020 cinema and gaming sales continued to grow but still not in large

enough quantities to generate positive net income and reduce the Debtor's working capital deficit, although positive EBITDA was achieved in 2017, 2019 and 2020.

Although total sales increased more than 35% from 2019, the Debtor's working capital deficit in 2020 increased $111,565 or 4% compared to the working capital deficit of ($2,922,395) at December 31, 2019. In 2019 two of the Debtor's employees took a 50% pay cut.

During early 2020, pre-COVID-19, the Debtor engaged a consultant with deep ties to the gaming and broadcast and technology markets in Silicon Valley to help the Debtor sharpen its strategic focus with the goal of being able to raise $5 to $10 million from either a financial (private equity, venture capital) or strategic partner, or to sell itself to the same.

When COVID-19 and the ensuing lockdowns hit in March of 2020 the Debtor suspended its fund-raising efforts and focused solely on staying in business. Gaming sales increased significantly during 2020 but gross margins from gaming sales are significantly lower, approximately 33%, than gross margin dollars from cinema sales (up to 50%).

The IFA was renewed several times with the expectation that the Debtor would begin to generate sufficient cash flow itself to secure its own inventory financing. The last renewal of the IFA ended September 30, 2020 and was not renewed due to the Debtor's financial condition. Since then, IMI and LFT have continued to extend purchase credit to the Debtor under the terms of the IFA, and without it the Debtor would not have a supply of product it can sell.

Financial results through the third quarter of 2020 were positive and the Debtor decided to restart its sale or fund-raising efforts. However, at year-end 2020 the Debtor had an accumulated shareholder deficit of ($13,175,240)

In the Fall of 2020, the Debtor hired a marketing agency to assist it to finalize its investment materials, pitch deck, executive summary, and its corporate website. From October of

2020 through January of 2021 the Debtor contacted more than thirty private equity, venture capital, investment bankers, financial firms and potential strategic partners seeking to raise capital, license its technology or sell itself. No offers were received by the Debtor from those efforts.

The Board believes the combination of its large, accumulated shareholder deficit of over $13 million, its large working capital deficit of over $3 million, and its history as a "penny stock" have helped to make it an unattractive investment regardless of its products and technology. Further, due to continuing COVID-19 mandated worldwide cinema closures, cinema sales plummeted by 94% in the 4th quarter of 2020 causing the Debtor to generate a significant net loss for the quarter and a net loss for the entire FY2020. Cinema capital expenditures are expected to further decrease in 2021 and not recover to pre pandemic levels for several years. Historically cinema sales have been over 40% of the Debtor's sales and generated close to one half of its gross margin dollars.

Therefore, on February 26, 2021, CJG Acquisitions, Corp., an Ohio corporation ("CJG"), the majority shareholders of Guitammer Nevada, took it private in a "cash out" merger, paying minority common and preferred shares $0.0019 and $0.0121 per share, respectively. The total cost of the merger buyout was $99,712.92. The Debtor remains a wholly owned subsidiary of Guitammer Nevada, which became a wholly owned subsidiary of CJG which paid the merger buy out costs and all transactional expenses. The shareholders of CJG are George Anasis (22.5%), Marvin Clamme (5.0%), Christopher Doyle (22.5%), John Gialamas (22.5%) and Mark Luden (27.5%). Mr. Anasis, Mr. Doyle and Mr. Gialamas own preferred shares; Mr. Clamme and Mr. Luden own common shares.

Debtor recently qualified and received a Paycheck Protection Program Loan from

KeyBank NA in the amount of $116,178 ("PPP Loan"). PPP Loan proceeds will be used by debtor to support employment of debtors' employees during the year due to the continued pressure on its sales because of COVID-19 effect on its customers, notably cinema. Debtor anticipates the entire loan will be forgivable under PPP Loan rules.

### SUMMARY

- The Debtor grew total sales in 2020 but did not generate positive net income and was unable to decrease its working capital deficit.

- Cinemas have been and continue to be adversely affected by COVID-19 and capital expenditures by cinemas have decreased significantly and are expected to stay at depressed levels for several years.

- The Debtor's gaming sales generate only two thirds of the gross margin dollars that sales to cinemas generate.

- The IFA ended September 30, 2020, and without debt reorganization IMI will no longer supply product to the Debtor.

- The Debtor was unable to generate any tangible interest from over thirty private equity, venture capital, financial firms, or strategic partners to invest additional capital under any terms, or to license its technology or to sell itself.

- Therefore, the Debtor is forced to restructure its debt to continue as a going concern.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 16, 2021

/s/ Mark Luden
Mark Luden, President.

Respectfully submitted,
s/ Frederic P. Schwieg
Frederic P. Schwieg, Esq. (0030418)
Attorney at Law
19885 Detroit Rd #239
Rocky River, Ohio 44116
(440) 499-4506
Fax (440) 398-0490
fschwieg@schwieglaw.com
Attorney for Debtor

## CERTIFICATE OF SERVICE

A copy of this Verified Statement was served on the following on the date filed by Notice of Electronic Filing though the Court's ECF/CM system, email or mail. (THE UST does not appear on the court's system but does receive all filings in

Airfoil Public Relations of CA
336 North Main Street
Royal Oak, MI 48067

Citadel Media
PO Box 403975
Atlanta, GA 30384-3975

Comcast SportNet California
PO Box 795517
City of Industry, CA 91716-9517

Sharon Anthony
Director of Development State of Ohio
77 S High St
Columbus, OH 43216-1001
Sharon.Anthony@development.ohio.gov
Wayne Dodaro
Dodaro Consulting
8779 Younts Peak Court
Las Vegas, NV 89178
wayne@dodaroconsulting.com

Chris Rose
Eminence Speaker LLC
P.O. Box 360
Eminence, KY 40019
chris.rose@eminence.com

Don Lee
Horizons Companies
4000 Horizons Drive
Columbus, OH 43220
donl@horizonscompanies.com

ICS
550 Parrott Street

San Jose, CA 95112

Jeffrey Deibel
Ice Miller
Opal Private Equity Fund LP
250 West Street
Columbus, OH 43215
Jeffrey.Deibel@icemiller.com

Jon Katz
38730 Glenlivet Ct
Solon, OH 44139
jonmkatz@roadrunner.com

Jerry Jacobs
Julie E. Jacobs Revocable Trust
1105 Schrock Rd Ste 602
Columbus, OH 43229
amgsj@aol.com

Debra J Hamber
Key Bank
PO Box 94920
Cleveland, OH 44101-4920
debra_j_hamber@keybank.com

Lawrence L. Lemoine
512 Francisco Street
Manhattan Beach, CA 90266
lllemoine@verizon.net

Chris Lennon
Media Answers LLC
19065 Pebble Beach Way
Monument, CO 80132
clennon@medianswers.tv

Chris Doyle
Merrill Lynch Bank USA
4661 Sawmill Rd FL 2
Columbus, OH 43220
chrisdoyle@forestcapitalgroup.com
Michael A. Renzelman
Schneider Downs & Co. Inc
65 E. State St #2000
Columbus, OH 43215
mrenzelman@schneiderdowns.com

Thelma Gault
91 Shelby Street
Eminence, KY 40019
tgault@iglou.com
Rob.Gault@eminence.com

Walter J. Doyle
Walter J. Doyle Trust

1970 Jewett Road
Powell, OH 43065
walterdoyle@forestcapitalgroup.com

/s/ Fred Schwieg
Frederic P. Schwieg